FILED
RICHARD W. NAGEL
CLERK OF COURT

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO** 22 FEB 18 AM 10: 03
**WESTERN DIVISION (at Cincinnati)**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : |  |
| **ex rel., BRIDGET MCGINLEY,** | : | **CASE NO.** _____ |
|  | : |  |
| **Plaintiff,** | : | **Judge  J. COLE** _____ |
|  | : |  |
|  | : |  |
|  | : |  |
| **DAYTON CHILDREN'S HOSPITAL** | : | **COMPLAINT FOR VIOLATION OF** |
| **1 CHILDREN'S PLAZA** | : | **THE FEDERAL FALSE CLAIMS ACT** |
| **DAYTON, OH 45404** | : | **(31 U.S.C. §3729, et seq.) AND OTHER** |
|  | : | **APPLICABLE LAW WITH JURY** |
| **SERVE:** | : | **TRIAL ENDORSED HEREON (FILED** |
| **Statutory Agent** | : | **EN CAMERA AND UNDER SEAL)** |
| **Dayton Children's Hospital** | : |  |
| **c/o C. Christopher Bennington** | : |  |
| **312 N. Patterson Blvd., Ste. 200,** | : |  |
| **Dayton, OH 45402** | : |  |
|  | : |  |
| **(Serve via Certified mail)** | : |  |
|  | : |  |
|  | : |  |
| **Respondent.** | : |  |

Case No. 1:22CV89

Plaintiff/Relator, Bridget McGinley, brings this *qui tam* action in the name of the United States of America, by and through undersigned counsel Glenn Feagan, against defendant/respondent Dayton Children's Hospital (the "Respondent"), and alleges as follows.

## I.   SUMMARY INTRODUCTION

1. This is an action by Relator on behalf of the United States of America against Respondent to recover penalties and damages arising from false statements, false claims, billing fraud, conspiracy to defraud, and fraudulent acts and omissions made in support of false Medicaid

claims, false Medicare claims, and fraudulently induced payments made to the government [the "false claims"] which were knowingly caused by Respondent and submitted to the government to get the false claims paid by the government.

2. The proceeds of the false claims were paid to Respondent by the government as a result of Respondent's fraud and deceit in the documentation, diagnosis, treatment and follow up of pressure injuries also known as pressure ulcers.

## II.    PARTIES

3. Relator is Bridget McGinley. She was employed by Respondent from July 2020 until February 1, 2022.

4. Respondent is a corporation for non-profit hospital operating in Ohio.

5. The agent for service of process for Respondent is C. Christopher, 312 N. Patterson Blvd., Suite 200, Dayton, Ohio 45402.

6. A significant number of Respondent' patients are covered by Medicare and/or Medicare.

## III.    JURISDICTION & VENUE

7. This action arises under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* and other applicable law.

8. This Court maintains subject matter jurisdiction over this action pursuant 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

9. This Court has personal jurisdiction over Respondent in this action because it is amenable to this Court's nationwide service of process at 31 U.S.C. §3732(a) and other applicable law. Additionally, Respondent's principal place of business is located in Montgomery County, Ohio and it transacts business in Ohio.

10. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because: (i) Respondent transacted business in this District and did so at all times relevant hereto, and as averred below, (ii) Respondent committed acts proscribed by 28 U.S.C. § 3729 in this District that give rise to this action.

11. Before filing this complaint, Relator served a copy of same upon the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

12. Relator has complied with all other conditions precedent to bringing this action.

13. Relator is the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegations herein might be deemed based, and has voluntarily provided such information to the Government before filing this action.

## IV.  QUI TAM AND RESPONDENT'S VIOLATIONS OF THE FALSE CLAIMS ACT.

14. Relator incorporates, adopts, and re-alleges as if fully restated herein the allegations contained in the above paragraphs.

15. As described in this Complaint and in the Affidavit of Relator attached hereto as **Exhibit A** in support of the Complaint, Respondent by and through its officers, agents, and employees, violated the False Claims Act, 31 U.S.C. §§3729, *et seq.,* when they: (i) knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claim for payment or approval of certain claims related to pressure injury wounds; (ii) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government of certain claims related to pressure injury wounds; and (iii) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

16. Respondent, by and through its officers, fraudulently and deceitfully diagnosed, treated, followed up and documented pressure injuries that children had prior to their admission or acquired during or after their admission at Respondent's facilities and then billed Medicare or Medicaid for the fraudulent diagnosis, treatment and follow up of the pressure injuries.

17. "Knowingly" is defined in the False Claims Act as (1) actual knowledge, (2) deliberate ignorance of the truth or falsity of the information, or (3) reckless disregard of the truth or falsity of the information.

18. As described in this Complaint and in Relator's Affidavit, Respondent, by and through its officers, agents, and employees committed violation(s) of the False Claims Act, and other improper acts and omissions, as alleged in this Complaint.

19. Respondent knowingly made false billing claims, falsified medical treatment, made false statements of material fact, falsified medical records, submitted false medical billing records, in order to obtain payment from Medicare or Medicaid and/or obtain other improper consideration and other payments from the United States.

## V.   COMPLIANCE AND REGULATORY BODIES IN THE HEALTHCARE SYSTEM

### 1.  MEDICARE/MEDICAID

20. Relator incorporates, adopts, and re-alleges as if fully restated herein the allegations contained in the above paragraphs.

21. Medicare is a federal health insurance system for individuals 65 years of age and older and for people with certain disabilities under the age of 65. Similarly, Medicaid is a federal health insurance system for eligible low-income individuals and families. At all relevant times hereto, the United States administered Medicare and Medicaid through the Health and Human Services' agency, the Centers for Medicare and Medicaid Services ("CMS").

22. Healthcare providers who participate in the Medicare and/or Medicaid program must enter into a contract with CMS, whereby the provider agrees to conform to all applicable statutory and regulatory provisions relating to Medicare/Medicaid payments and reimbursements. *See* 42 U.S.C. § 1395cc.

23. Moreover, such providers are prohibited from making false statements or misrepresentations of material facts concerning the payment of claims or reimbursements, billing for services or products that were not performed according to applicable policies, and engaging in illegal activities. *See* 42 U.S.C. § 1395, *et seq.*

24. Title XVIII of the Social Security Act section 1862 (a)(1)(A) allows coverage and payment of those services that are considered to be medically reasonable and necessary.

25. It is critical to the continued solvency and integrity of the Medicare and Medicaid systems that healthcare providers and institutions bill only for services that are actually performed within the established requirements.

26. At all relevant times herein, Respondent was a participating Medicare and Medicaid provider, and therefore was required to obey all federal and state laws and regulations governing such provider, including the FCA, 31 U.S.C. § 3279, *et seq.*

## 2. JOINT COMMISSION ON ACCREDITION OF HEALTHCARE ORGANIZATIONS ("JCAHCO" OR THE "JOINT COMMISSION")

27. Relator incorporates, adopts, and re-alleges as if fully restated herein the allegations contained in the above paragraphs.

28. JCAHO is a nonprofit organization based in the United States that accredits over 20,000 healthcare organizations and programs in the country. The JCAHO commonly is referred to as the Joint Commission in the healthcare industry and among governmental industry.

29. CMS and the Joint Commission are bodies designed to ensure compliance with federal regulatory standards for hospitals. The goal of these programs is to ensure quality care and patient safety. By complying with the standards set by the organizations, there is greater consistency of care, better processes for patient and staff safety, and thus higher quality of care.

30. Hospitals must meet eligibility standards established by the federal government in order to receive reimbursement from the federally funded programs, Medicare and/or Medicaid. CMS has been designated as the organization responsible for certification of hospitals, deeming them certified and meeting established standards. The Joint Commission sets its standards and establishes elements of performance based on the CMS standards. CMS has approved the Joint Commission as having standards and a survey process that meets or exceeds the established federal requirements. If a hospital is certified by the Joint Commission, they are deemed eligible to receive Medicare and/or Medicaid reimbursement. A hospital that is accredited by the Joint Commission is by definition compliant with CMS. However, a hospital that is compliant with CMS is not necessarily accredited by The Joint Commission.

## VI.   PRESSURE INJURIES – WHAT ARE THEY?

31. Relator incorporates, adopts, and re-alleges as if fully restated herein the allegations contained in the above paragraphs.

32. CMS defines a pressure injury, also known as a pressure ulcer, as a localized injury to the skin and/or underlying tissue usually over a bony prominence, suffered as a result of pressure, or pressure in combination with shear and/or friction.

33. Pressure injuries are staged based on the level of tissue injury or damage that is visible or can be directly palpated. When the deepest anatomic structures within the injury are visible and can be identified, numeric stages are used. (Stages 1-4). When the deepest anatomic structures

of the wound cannot be identified, other categories are used to described the injury: (i) unstageable when the extent of tissue damage is obscured by slough or eschar or (ii) Deep Tissue Pressure Injury ("DTPI").

34. A hospital-acquired pressure injury ("HAPI"), is a localized injury to the skin and/or underlying tissue during an inpatient hospital stay. The result of pressure, shear, or both, HAPI development is additionally associated with other factors (e.g., advanced age, immobility, perfusion, nutritional status, hematological measures, illness severity, and presence of diabetes. National Pressure Ulcer Advisory Panel [NPUAP], European Pressure Ulcer Advisory Panel, & Pan Pacific Pressure Injury Alliance, 2014).

35. Generally considered preventable, HAPIs are accepted nursing quality indicators.[1] Hospitals are facing increased demand to prevent hospital-acquired pressure injuries. Any stage 3, stage 4, or unstageable PI acquired after admission are considered a "Serious Reportable Events."[2] Additionally, the CMS considers stage 3 and 4 pressure injuries, not present on admission as "hospital-acquired conditions" for which hospitals can no longer bill additional charges. *Id.* Although these rules initially applied to Medicare patients, many Medicaid and private insurers are now following suit. Using care bundles to avoid hospital-acquired conditions is a quality improvement methodology that is gaining increasing recognition. *Id.*

36. Most importantly, HAPIs are usually associated with a longer hospital stay, pain, infection, and even death. Hospitals are not eligible to receive full reimbursement from the CMS for advanced-stage HAPIs—making pressure injuries an important management target.

---

[1] *See* Baharestani et al., 2009; Bergquist-Beringer, Davidson, & Cuddigan, 2017.
[2] *See* Impact of a Pressure Injury Prevention Bundle in the Solutions for Patient Safety Network (nih.gov) (last visited 2/9/2021)

37. A bundle is "a set of interventions, preferably evidence-based, intended for a defined patient population and care setting that, when implemented together, will result in better outcomes than when implemented individually." *Id.*

## VII. PRESSSURE INJURIES – PREVENTION RECOMMENDATION AND TREATMENT

38. Relator incorporates, adopts, and re-alleges as if fully restated herein the allegations contained in the above paragraphs.

39. The National Database of Nursing Quality Indicators® ("NDNQI"®) is the only national, nursing quality measurement program which provides hospitals with unit-level performance comparison reports to state, national, and regional percentile distributions. It also serves as a benchmark for standard of care. All indicator data are reported at the nursing unit level. NDNQI's nursing-sensitive indicators reflect the structure, process, and outcomes of nursing care. Currently, NDNQI has over 1,500 participating U.S. hospitals that use NDNQI data to improve patient safety and quality of patient care.

40. The NDNQI has determined that the prevention of pressure injuries is a great concern in health care today and identified that a program of pressure ulcer prevention reduces pressure ulcer occurrence. A program of prevention includes daily skin assessment, daily risk assessment, risk redistribution, surface use, routine repositioning, nutritional support and moisture management.

41. The turning and repositioning of patients who cannot move reduces the magnitude of tissue pressure. Thus, for those patients unable to turn themselves, the usual standard of care is to turn and reposition those patients *every 2 hours*. Patients at high risk of pressure injuries may need more frequent interventions.

42. The NDNQI also prescribes the use of special support surfaces to redistribute pressure on skin and subcutaneous tissues or other parts of the body exposed to pressure. Such support systems include air, gel, water or high intensity foam mattresses, overlays, special mattresses or chair cushions whose role is to redistribute pressure. Use of padding or positioning devices to protect from pressure is also recommended.

43. According to the NDNQI, any and all pressure injury/ulcer interventions received by the patient should be documented in the patient's medical record.

**IIX.**  **CMS REQUIREMENTS**

44. Relator incorporates, adopts, and re-alleges as if fully restated herein the allegations contained in the above paragraphs.

45. The CMS defines wound care as "care of wounds that are refractory to healing or have complicated healing cycles either because of the nature of the wound itself or because of complicating metabolic and/or physiological factors. This definition excludes (i) the management of acute wounds, or (ii) the care of wounds that normally heal by primary intention such as clean, incised traumatic wounds, or (iii) surgical wounds that are closed primarily and other postoperative wound care not separately covered during the surgical global period.[3]

46. Medicare coverage for wound care on a continuing basis for a given wound in a given patient *is contingent upon evidence documented in the patient's medical record that the wound is improving in response to the wound care being provided* (emphasis added). *Id.* Evidence of improvement may include measurable changes in, for example, drainage, inflammation, swelling, wounds dimensions, etc...*Id.*

---

[3] LCD - Wound Care (L37166) (cms.gov) (last visited Feb. 14, 2022).

47. *Wound care must be performed in accordance with accepted standards for medical and surgical treatment of wounds* (emphasis added). *Id. Adjunctive measures include but are not limited to appropriate control of complicating factors such as pressure (e.g., off-loading, padding, appropriate footwear)*, infection, vascular insufficiency, metabolic derangement and/or nutritional deficiency. *Id.*

48. Finally, CMS requires that (i) all documentation be maintained in the patient's medical record and made available to the contractor upon request; (ii) every page of the record be legible and include appropriate patient identification information (e.g., complete name, dates of service(s)); (iii) the documentation include the legible signature of the physician or non-physician practitioner responsible for and providing the care to the patient; (iv) the submitted medical record support the use of the selected [...] code(s). The submitted [...] code must describe the service performed; (v) *the most accurate and specific diagnosis code(s) must be submitted on the claim; (vi) the patient's medical record indicate the specific signs/symptoms, and other clinical data supporting the diagnosis code(s) used* (emphasis added). *Id.*

49. The physician must document the current status of the wound in the patient's medical record and the patient's response to the current treatment. *Id.*

50. The patient's medical record must contain clearly documented evidence of the progress of the wound's response to treatment at each physician visit. This documentation *must include*, at a minimum: (i) current wound volume (surface dimensions and depth); (ii) presence (and extent of) or absence of obvious signs of infection; (iii) presence (and extent of) or absence of necrotic, devitalized or non-viable tissue; (iv) other material in the wound that is expected to inhibit healing or promote adjacent tissue breakdown.

51. Identification of the wound location, size, depth and stage by description and may be supported by a drawing or photograph. Photographic documentation of wounds immediately before and after debridement [4] is recommended for prolonged or repetitive debridement services (especially those that exceed five debridements per wound). Photographic documentation is required for payment of more than five extensive debridements (beyond skin and subcutaneous tissue) per wound.

## IX. FACTUAL ALLEGATIONS

53. Relator incorporates, adopts, and re-alleges as if fully restated herein the allegations contained in the above paragraphs.

54. Relator is a citizen of the United States and a citizen of the State of Kentucky.

55. Relator brings this action based on her direct, independent and personal knowledge and is the original source of information to the United States and has voluntarily provided this information to the United States prior to the filing of this action.

56. Relator has been a registered nurse for almost twenty-two years. She holds a bachelor of nursing from Wilmington College.

57. Relator works primarily in pediatrics. She received extensive training in wound care training by attending the RB Turnbull, JR. MD WOC Education Program at the Cleveland Clinic in 2019 and obtained her wound care certification in April 2019. Also in 2019, she received training in Hyperbaric Oxygen Therapy ("HBO").

58. Relator worked for four years at St. Elizabeth Hospital Wound Care/HBO clinic.

59. Relator accepted employment with Respondent in July 2020. She began working in Respondent's South Campus Emergency Room. On December 7, 2020, she accepted a transfer to a Wound Ostomy

---

[4] Debridement is the process of removing dead tissue from pressure ulcers, burns or other wound to help the wound heal.

and Continence nurse ("WOCN")/pressure injury prevention nurse position at Respondent's Main Campus.

60. On February 1, 2022, she gave her two-weeks notice to Jen Isham, director of Pediatrics Intensive Care Unit ("PICU"). Jen Isham accepted Relator's resignation and told Relator that February 1, 2022 would be her last day.

61. The United States is the real plaintiff-in-interest with respect to the claims asserted herein. The United States, acting through the Department of Health and Human Services ("HHS") and the "CMS, administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare"), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.* ("Medicaid").

62. As noted above, Relator was hired as a WOCN/pressure injury prevention nurse and has extensive training in both prevention and treatment of wounds and pressure injuries. As a wound care certified nurse, she has extensive clinical expertise and training in not only staging wounds but also offers consultation to providers for the treatment of such wounds and to ensure compliance with governmental guidelines in wound care.

63. During the course of her employment with Respondent, Relator has personally observed multiple violations of not only the standard of care associated with the prevention and treatment of wounds and pressure injuries, but extensive fraud, negligence and deceit in the diagnosis, staging, treatment, follow up of pressure ulcers that patients had prior to being admitted at Respondent or acquired after their admission.

64. Relator has also personally witnessed and has first-hand knowledge of Respondent's fraudulent documentation of pressure ulcers/ injuries as well as documentation of pressure ulcers/injuries that is not compliant with CMS guidelines.

65. Relator has also witnessed and has first-hand knowledge of Respondent's downstaging wounds so as to be able to submit and obtain payment of claims from Medicare/Medicaid.

66. For example, on December 7, 2021, Relator was asked to evaluate, through photograph, a patient with a pressure injury that Respondent had classified as Stage II. Relator determined that the patient more likely than not had a Stage III pressure ulcer but insisted that she needed to see the patient in person to fully evaluate her. Not only was she not allowed to see the patient but a few weeks later, she noticed that the wound had been changed from a pressure ulcer to a wound-coccyx avulsion. Rel. Affidavit at p. 3.

67. As mentioned in Section VI, above, a Stage III pressure injury is not covered by Medicare/Medicaid.

68. On December 8, 2021, Relator did skin audit rounds and immediately noticed severe violations of wound care protocols, treatment of the wounds and false documentation. One patient named C.S. was a paraplegic and had a documented Stage II pressure injury to his coccyx and was not treated according to standard of care by the wound care team. *Id.* at p. 4.

69. Among other things, C.S, despite being paraplegic and unable to turn himself, was not on a specialty bed mattress. Relator was told that these beds were too expensive to rent and were not carried by Respondent. *Id.*

70. C.S's mentioning during those skin audit rounds that his wound "had gone to the bones," prompted Relator to investigate the wound further. On December 9, 2021, Relator was able to look at C.S's chart and noted that he had a Stage IV documented and treated pressure injury when he was at

Cincinnati Children's Hospital Medical Center and needed six weeks of IV antibiotics therapy for osteomyelitis. Technically, his pressure injury was a healing Stage IV and therefore needed even more special attention. *Id.* at p. 5. Thus, while C.S.'s wound had healed up when he was at Cincinnati Children's Hospital, after his transfer at Respondent, his wound had worsened due to the lack of proper treatment and appropriate control of complicating factors such as providing him with the proper bed.

71. Relator shared her concerns with Karen Reeder, a clinical nurse specialist for the PICU who ignored her. Relator also told Karen Reeder that documentation and wound care protocol was not being followed according to CMS's guidelines. *Id.*

72. Karen Reeder responded as follows: "we are a small hospital. CMS does not really care about us. Our priority is Solutions for Patient Safety ("SPS"). [5] *Id.*

73. When Relator later asked about her role and again noted the errors in the documentation of the pressure injuries, she was told that if she wanted to be successful, she should focus just on pressure

---

[5] The Children's Hospitals Solutions for Patient Safety (SPS) Network is a learning collaborative working together to eliminate harm to hospitalized children. SPS used a 3-pronged approach to prevent pressure injuries: (1) active surveillance, (2) implementing and measuring compliance with the prevention bundle, and (3) deploying a wound ostomy team. It represents the first and one of the most significant efforts by children's hospitals to eliminate harm to hospitalized children. Initially started by the Ohio Children's Hospital Association in 2009, Ohio State officials, the Ohio Department of Health, and eight Ohio children's hospitals joined together to establish the Ohio Children's Hospitals Solutions for Patient Safety Network to focus on specific pediatric quality improvement projects. In 2011, following success in Ohio, 25 additional hospitals from outside Ohio joined this initial group to launch the SPS Network and implement quality improvement and patient safety strategies across the country. In 2015, the Network grew to encompass more than 100 children's hospitals in total and expanded into Canada.
Leaders from these hospitals have committed to clear, shared Network goals of harm reduction by December 31, 2018: 40 percent reduction in Hospital-Acquired Conditions (HACs), 20 percent reduction in 7-Day Readmissions, 50 percent reduction in Serious Safety Events (SSEs), and 25 percent reduction in DART—Days Away Restricted or Transferred (by June 2019). SPS Network focuses on 11 specific HACs: ADEs, catheter-associated urinary tract infections (CAUTIs), central line-associated blood stream infections (CLABSIs), injuries from falls and immobility, pressure injuries, surgical site infections, ventilator-associated events (VAE), venous thromboembolism, peripheral intravenous infiltration and extravasations (PIVIEs), unplanned extubations, and c. difficile and antimicrobial stewardship.
SPS Network is also one of the 16 members of the Hospital Improvement Innovation Networks (HIINs), part of the Center for Medicare & Medicaid Services' (CMS') Partnership for Patients, an initiative that engages in public-private partnerships to improve the quality, safety, and affordability of health care for all Americans. HIINs help identify proven solutions for continued harm reduction, and disseminate them to other hospitals and providers. See Children's Hospitals' Solutions for Patient Safety Network (SPS Network) | Agency for Healthcare Research and Quality (ahrq.gov) (last visited 2/8/2021)

injury prevention. Relator was stunned because according to her job description, she was a WOCN/ and pressure injury prevention nurse and both care and prevention were within the scope of her duties. *Id.*

74. On December 10, 2021, Meghan Moore, another clinical nurse specialist in the Specialty Pediatrics Department informed Relator that she would be the leader of the HAPI committee and would also be responsible for the SPS/HAPI bundle compliance. *Id.* at p. 6. Relator later that day was told by Hila Collins, the Director of Safety, that she was never to contact the physicians listed on the site for the HAPI bundle. *Id.* at p. 6.

75. This prohibition sounded very strange to Relator as it is a common practice to collaborate with other health care professionals. *Id.*

76. In the following days, Meghan Moore told Relator that if Relator were to change the Skin and Wound Policy to be compliant with CMS guidelines, "leadership would not approve it." *Id.* at p. 8.

77. Relator also received push back from Jen Isham when she proposed changes to Respondent's skin assessment policy from Respondent's current practice of performing a skin assessment within 24 hours upon admission to performing one within 12 hours. Such change is necessary to comply with CMS guidelines. *Id.* at p. 9. Relator also addressed Respondent's policy related to photographing, staging and treatment of the wounds which was not in compliance with CMS or JCAHCO guidelines. *Id.*

78. Despite not complying with CMS guidelines, Respondent submitted and continues to submit claims related to wounds and PIs to Medicare and Medicaid and receive payment therefrom.

79. Relator also received push back when she proposed changes to the wound care program. She was told that the surgery nurse practitioner and the plastic nurse practitioner were in charge of wound care but that they were hard to reach and do not follow through with wound care. *Id.* at p. 10.

80. Relator witnessed wounds not being treated or seen once and never addressed again. Relator personally observed that Respondent's treatment of wounds does not follow best practices and despite not being trained to, bedside nurses are staging wounds and feeling very uncomfortable about it due to their lack of training as to such treatment. *Id.* at p.p. 10-11.

81. Despite not following best practices as required by CMS guidelines, Respondent submitted and continues to submit claims related to wounds and PI's to Medicare and Medicaid and receive payment therefrom.

82. The lack of patient wound care and staging with proper treatment is causing more injuries to the children and denies them the care they deserve. Nonetheless, Respondent refuses to educate bedside nurses. *Id.*

83. Relator also received push back when she suggested the reformulation of Respondent's skin audit process to comply with best practices and CMS/JCACHO guidelines. *Id.* at 11. Despite having a noncompliant skin audit process, Respondent submitted and continues to submit claims related to wounds and PI's to Medicare and Medicaid and receive payment therefrom.

84. In a 6-month retrospective research of patients with PI's, while doing a root cause analysis of problem areas, Relator printed off the SPS Excel Spreadsheet of patients from June 2021 to December 2021. *Id.* at p. 12. Relator checked patients one by one to see whether among other things, there was a proper description of the wound and whether there was a stage entered upon first finding of the PI as CMS guidelines require. *Id.* She also looked at the physician or provider notes to see if the wound was acknowledged and treated as required by CMS guidelines. *Id.*

Finally, she looked at whether assessments were completed and if the wound was closed, healing or left open in the chart with a final picture as required by CMS. *Id.*

85. For many wounds, Relator founds that staff had put in a wound under the PI wound assessment, but all the properties were not completed. She also found that many of the PI wounds had been relabeled under a generic wound assessment and as a result such wounds were not reported as HAPI and were not reported to SPS. *Id.* at 13. Related also witnessed that some of the wounds were assessed at one stage and then down staged later. *Id.*

86. Despite not properly documenting wounds, Respondent submitted and continues to submit claims related to wounds and PIs to Medicare and Medicaid and receive payment therefrom.

87. Related repeated her concerns that those practices were illegal and not in compliance with CMS but was not heard. *Id.* at 15.

88. Relator also voiced her concerns about the lack of proper documentation, including the failure to include photographs of the wounds, in EPIC, a healthcare software used by hospitals. *Id.*

89. The lack of documentation in the assessment, treatment and follow up of a wound or a PI is a serious departure from the professional standards of care. *Id.* In addition, because documentation lays the foundation of proper coding and billing, it results in improper submission of claims to Medicare or Medicaid and therefore improper payments.

90. Despite the foregoing, Respondent submitted and continues to submit claims related to wounds and PIs to Medicare and Medicaid and receive payment therefrom.

91. Faced with the incessant red tape, push backs, lies, passive aggressive behavior, blatant disregard for government regulated guidelines, patient safety and the lack of concern from senior nursing staff, Related filed reports with (i) the Office of the Inspector General, (ii) the Ohio Office of the Attorney General on January 13, 2021, (iii) on January 15, 2022 with JCAHO. *Id.* at p. 17; and

(iv) on January 31, 2022, with the Ohio Board of Nursing. A true and accurate copy of each of these reports is attached hereto as **Exhibit B.**

92. On or about January 19, 2022, Relator had a meeting with Jayne Gmeiner, Respondent's Chief Nursing Officer, Hila Collins, Respondent's Director of Clinical Safety and Jen Isham, the PICU Director. At that meeting, Relator questioned again the documentation of a coccyx wound initially entered as a generic wound at the time of the patient's admission. The wound had not been properly entered, had not been reported properly and, as a result of not being followed properly, had gotten worse and had become a Stage III or IV PI, thus not covered by CMS.

93. Relator personally observed Respondent, through Tammy Witmer, deactivating the wound from the computer network so as to make it disappear.

94. Deactivating the wound enabled Respondent to hide the severity of the wound, to not be reported and escape any fine that can be imposed by JCAHO and can affect accreditation.

95. On February 1, 2022, Relator, unable to continue to work in such an environment, gave Jen Isham her two weeks- notice. Jen Isham accepted Relator's resignation but told her that her last day would also be February 1, 2022.

### COUNT ONE – FALSE CLAIMS ACT (31 USC 3729(a)(1)(A))

96. Relator incorporates, adopts, and re-alleges as if fully restated herein the allegations contained in the above paragraphs.

97. Respondent knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval.

98. Respondent made claims to the United States Government that it knew were false or

fraudulent, and it sought payment for those claims from the federal treasury. Additionally, Respondent made express and implied certifications that it knew were false in order to obtain payment for its claims from the United States.

99. Respondent had actual knowledge of the falsity or fraudulent claims, or was deliberately ignorant of the truth or falsity of the information, or recklessly disregarded the truth or falsity of the information.

100. Respondent's conduct has caused damage to the United States.

## COUNT TWO – FALSE CLAIMS ACT (31 USC 3729(a)(1)(B))

101. Relator incorporates, adopts, and re-alleges as if fully restated herein the allegations contained in the above paragraphs.

102. Respondent created, used or caused to be used, a record or statement to the United States Government that they knew were false or fraudulent in order to get a false or fraudulent claim paid or approved by the Government.

103. Respondent's conduct has caused damage to the United States.

## PRAYER FOR RELIEF

**WHEREFORE,** that as a direct and proximate result of the false claims, acts and omissions as stated herein, Relator and the United States of America have been financially damaged and defrauded as a result of Respondent in violation of the False Claims Act. Relators demand judgment against Respondents on all claims and the payment of all monetary damages and benefits available and recoverable to Relator and his counsel under applicable law, and the imposition of fines, penalties and restitution as necessary. Relator further requests:

1. Attorney's fees;

2. Costs associated with the disbursement of this action;

3. Interest;

4. A hearing prior to settlement or dismissal;

5. A proportionate share of any alternate remedy obtained pursuant to USC Section 3730 (c)(5);

6. Trial by jury on all issues so triable; and

7. All other relief this court deems fitting and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator demands trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Glenn Feagan*
Glenn Feagan (Bar No. 041520)
Deters Law
5247 Madison Pike
Independence, KY 41051
Phone. (859) 363-1900
gfeagan@feaganlaw.com

Counsel for Relator

## CERTIFICATE OF SERVICE

I certify that true and correct copies of the foregoing were served upon the following by depositing the same into the United States certified mail, return receipt requested, at the addresses indicated below on the 18th day of February, 2022:

The Honorable Merrick Garland
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

The Honorable Vipal Patel
United States Attorney
Southern District of Ohio
303 Marconi Boulevard, Suite 200
Columbus, OH 43215

/s/ Glenn Feagan
Glenn Feagan (Bar No. 041520)

# EXHIBIT A

**Affidavit of Bridget McGinley Against Dayton Children's Hospital**

After Being Duly Sworn And Cautioned States As Follows:

I am a registered nurse of 22 years (this May) with a bachelor's degree in nursing. I have primarily worked pediatrics and have a certification in pediatrics (CPN). I obtained extensive wound care training by attending the R.B. Turnbull, Jr MD WOC Nursing Education Program at Cleveland Clinic in 2019. I acquired wound care certification in April 2019. I worked for 4 years (2 years PRN and 2 years full time) at St Elizabeth Hospital Wound Care/HBO Clinic. I also had extensive training when I attended a weeklong HBO course held by Healogics in Jacksonville, FL in 2019. I began working for Dayton Children's Hospital in July of 2020 in the South Campus ER. I accepted a transfer to the WOCN nurse position and started this role December 7th at DCH Main Campus.

Since starting the WOCN/ Pressure Injury Prevention Nurse position (see Job description) at Dayton Children's on December 7th, 2021, I have noted extensive fraud, negligence and deceit in documentation, diagnosis, treatment and follow up of pressure injury wounds that the children have had either prior to admission into the hospital or when it was acquired in the hospital. I have noted a deliberate evasion, especially by nursing administration, to deflect any wound care or staging to my role despite being the **only** certified wound care nurse in the hospital. I have notified many of the senior nursing leadership team of my concerns surrounding CMS and JACHO violations specifically surrounding wound care/pressure injury prevention and staging of wounds and will henceforth describe these interactions in detail. I have told by my director (Jen Isham), Chief Nursing Officer Jayne Gmeiner and Clinical Nurse

1

Specialists (Karen Reeder and Meghan Moore) of my concerns. My only job at DCH repeated over and over by them is that I am only qualified to provide "Pressure Injury Prevention care and education" NOT wound care or staging of a pressure injuries greater than Stage I. I have offered to educate staff as per my job description and my offers have been deflected. To date I have not been allowed to do any staff education. There have been deliberate attempts to change my job role and I have been given 3 different job descriptions (enclosed in binder). I have been instructed that I am only allowed to operate according to an email dated 4/5/2021 by Jayne Gmeiner (see email exchange from 12/21) despite having a job description that was assigned to me in Workday when I signed the contract for the position. A later version of the job description was handed to me by Karen Reeder (see enclosed in binder) but not emailed to me by Jen Isham (my director)or HR. I asked Jen Isham for a copy on 1/18 and she stated that her computer was not working properly, and she could not print off the description.

To note any RN is allowed to stage a pressure injury as defined by the State of Ohio Board of Nursing in the standard of practice for an RN. Wound Care certified nurses have extended clinical expertise and training to not only stage but also offer consultation to providers for the treatment of such wounds and ensure compliance with governmental guidelines in wound care.

Accompanying this affidavit is a JACHO's Quick Safety bulletin and the NPUAP (National Pressure Ulcer Advisory Panel) position on staging that discusses PI prevention and Pressure Injury care guidelines mandatory for every hospital dated 2016 and 2017 respectively. Pressure Injuries are considered a hospital acquired condition and if obtained during hospitalization will not be covered by Medicare or Medicaid services as of 2008. A stage III, IV or unstageable

2

pressure injury is considered a sentinel event and is reported by the hospital to regulatory bodies. Also, I will reference CMS guidelines surrounding wound care. A printout is attached with this affidavit. I am specifically referring to information located under "General Information- Documentation Requirements". I am including guidelines from Solutions for Patient Safety: Operational Definitions, Prevention Bundle (PI's) and SPS Active Surveillance Toolkit. I will be attaching SPS data (names, medical record numbers and staging information) from an excel spreadsheet that is used when submitting data to the SPS organization by Dayton Children's Hospital. Finally, I have included most email interactions along with some screen shots to verify complicacy of nursing leadership in DCH.

I started my new role on December 7th, 2021. I was first taken to a meeting to review PI's that were being placed on the reporting sheet from November 2021 to submit to SPS (Solutions for patient Safety). Karen Reeder, Meghan Moore, Ameena and Lisa Scherbauer were in attendance. Some of the wounds had pictures and I was asked my opinion of the staging. Immediately I could sense that staging was a concern to everyone. One patient who was in the Heme/Onc unit had a sacral PI but was not staged properly (they said Stage II). MR # 642261 patient A.S..I stated that it appeared to be a stage III due to open skin and drainage in the picture but I reiterated that I would have to see it in person to make an official assessment and staging. I was never allowed to see the patient in person. Meghan and Karen glanced at each other multiple times during this meeting and there was tension in the room. This patient is, as of today, not on the SPS report list for November. She was removed. In looking at her chart, she had a PI wound changed to wound-coccyx "avulsion" on 11/17. APRN Amy Kosanovich saw her for wound care. During the meeting Karen and Meghan questioned me over and over about the

3

other patients. I started to see that there was documentation, assessment, and staging errors. I immediately sensed evasion and deception.

On December 8th 2021, I did skin audit rounds (aka active surveillance-see definition in SPS operational definitions) with Tammy Witmer and immediately noted severe violations to wound care protocols, treatment of the wounds and false documentation. One patient named C.S. (MR # 627551) a paraplegic concerned me. The patient had a documented "Stage II" pressure injury to his coccyx and was not being treated properly by the wound care team. His orders were: cleaning with Vashe, collagen application and Mepilex dressing two to three times a day. This is inappropriate as collagen is not supposed to be changed that often. He was not on a specialty bed/mattress despite having a PI and being paraplegic. He was refusing turns. I mentioned my concerns and suggested a sand bed (see the bed selection decision tree in Skin and Wound policy attached). I stated it should be the Clinitron RiteHite and was told that specialty beds are expensive because the units are charged for the rental and that they were not available at the time as they were not carried in the hospital. (To note: later Meghan Moore told me that these beds had been complained about from families as being "too noisy". I told her that they were necessary for some skin conditions and pressure injury prevention. I also told her that I have never had a family refuse especially when given proper education about the bed and its purpose).

On December 9th, I met with Karen Beekman in the NICU to get a 4-hour orientation. Later I went up to the PICU and I was able to look through C.S. MR # 627551 chart and noted that he had had a Stage VI pressure injury documented and treated when he was at Cincinnati

4

Children's and needed 6 weeks of IV antibiotic therapy for osteomyelitis. Technically his current Pressure injury was a healing stage IV and therefore needed even more special attention. He had mentioned during skin rounds the day before that it had "gone to the bone" thus the reason I researched his wound further. I informed Karen Reeder and she started acting suspicious. She kept walking away from me. At one point during this week, I told Karen Reeder that documentation and wound care was not being followed according to CMS guidelines. She stated," We are a small hospital CMS does not really care about us. Our priority is SPS." I was flabbergasted.

During this week, I keep hearing bits and pieces of rumors about Abby Riedel who was the Wound Care APRN that had been "fired" but no one would give a clear explanation. I also started to get more firm insistence from Karen that my role was "Pressure Injury Prevention only". At one point when I was asking questions about some of the documentation errors, she stated that if I wanted to be "successful" I should probably just focus on pressure injury prevention. I was stunned as my job role per the description was Wound Care and Pressure Injury prevention. The two roles cannot be separated.

On December 10th Meghan Moore met with me to discuss the Bed decision tree (I suspect Tammy told her about my concerns about not having a specialty bed for the paraplegic). This tree is in the Skin and Wound Care policy section of DCH policies. Meghan is extremely computer savvy, and she was trying to teach me different programs and how to get to them extremely too fast so that I do not see all the steps she took to get to where I need to go. She was also at times condescending to me when I could not keep up with her or was not as witty

5

with computer technology. She had access to SPS and pulled up the website for me to look at. She wanted to sign over the Skin and Wound policy to me this day. She also informed me that I would be the leader on the HAPI (Hospital Acquired Pressure Injury) committee and be responsible for the SPS HAPI bundle compliance. She reviewed with me that there was compliance issue with the prevention bundle from SPS especially in turning patients.

Later that day I met with Hila Collins, director of safety, to discuss SPS (Solutions for Patient Safety). Hila was acting very suspicious about me getting access to this program. She literally typed on the keyboard with only her index fingers which I found very strange especially as she was the clinical safety director and responsible for data. She told me that I probably would not get access for a month to the SPS program (Meghan printed off the bundle compliance information for me through her access). Hila told me that I was never to contact the physicians listed on the site for the HAPI bundle and only contact the nurse experts. She also said that I cannot go to conferences unless she thinks it is important for my role.

She then spent 2.5 hours talking to me about her dead husband, COVID, and telling me many patients had died at DCH because of COVID. I later found out that was untrue, no patient had died until Jan 7th, 2022. She seemed to me to be trying to get my history and views on COVID and my vaccine status. I answered all questions with political correctness and never shared with her my personal views or vax status except to say that I believed in medical freedom of choice. I did ask her about the chain of command when reporting data to SPS. She informed me that she does not "look over the shoulder" of those who give her the information. She is the one who reports all the HAC (Hospital Acquired Conditions to the regulatory and SPS systems). I finally

6

obtained SPS access 1/19 but to note the email was sent for access 12/17/2021 but did not get delivered to my account (see email exchange 1/20/2022). I was able to pursue on the SPS website via Meghan's access and noted I did have an email account (see photo in Gmail from 12/29/2021 which proves SPS has my information). I had been asking over and over about getting access and informed multiple people including Dr. Cox that I did not have access from mid-December to Jan 20th.

Hila struck me as odd because she even got lost when trying to navigate through tabs open on her desktop. I was told by her some more details of Abbie's firing which was very confusing and that one of the doctors had designed my job role for me. I found that very strange! On Friday, Dec 17th I emailed her some questions regarding SPS because I was confused at what I was seeing and hearing at DCH(see email interaction 12/17). I read a report from another Children's Hospital (Key Drivers in Reducing Hospital-acquired Pressure Injuries at a Quaternary Children's Hospital-see printed copy). She literally told me to "be careful" in my reading!!!! She stated that she had the "advantage because she had been with SPS since the beginning". She then told that since October 2019 the HAPI rate was 0 at DCH. That is impossible!!

On December 14th I met with Meghan Moore and the bed decision tree was again reviewed. She started asking my opinion on how to teach staff about using the "self" position charting option in the cares section of EPIC and stated that they were falling out of HAPI SPS bundle compliance with turning every 2 hours high risk patients as designated by the Braden Q sore. See Braden Q Scale in print outs. The Braden Q scale is a measured tool to determine risk of skin breakdown. The lower the number the higher the risk. The highest number is 28. Every

7

bedside nurse is aware of this scale. She said that Lisa Scherbauer would "ding" them on this due to negligent staff documenting (I was baffled because this is self-explanatory). See email exchange (12/9 & 12/23 & 12/28). Every nurse I know understands that if you chart "self" in turning it means the patient can position themselves independently. I continued to hear very confusing stories on why Abby Riedel was fired...i.e, too scattered in care, practicing without an attending physician, getting into fights with doctors. I started to go through her files and past meetings along with education she shared. I was attempting to see why she had put the high-risk classification as a Braden Q of ≤ 22. No one could answer this for me. I suspected that there had been incidents of PI's and that she did this to protect the patients at risk. I found her information in the Clinical Safety PI folder. She appears to have been giving out proper wound care information per her online documents. I am VERY confused about why they fired her. Karen Reeder stopped scheduling me for orientation (see email exchange 12/13) and she started acting very suspicious. She would act dumb and seemed to know nothing about wound care because she would be asking me elementary and stupid questions. I found out that she was part of Abby's IQIC project in 2018-2019 and a member of the wound care meetings as early as 2018 and knew exactly what is involved in nursing care with wounds! (See copy of meeting minutes and power point printout).

On the following days that I worked, I was told by Meghan Moore that if I tried to change the Skin and Wound policy to be compliant with CMS that "leadership" would not approve it. I eventually submitted a change on 1/5/2022 (see email exchange) and was questioned extensively that afternoon by my Director, Jen Isham about changing the policy. Meghan was right. Leadership did not want it changed. Jen questioned me regarding my request to change

8

the required time of initial skin assessment from 24 hours of admission to 12 hours. I was extensively questioned about changing the documentation of the Braden Q score to every 12 hours which is not only best practice but common practice (EPIC already had this prepopulated-see my email response to Jen). In fact, NDNQI (National Database of Nursing Quality Indicators) had suggested this and can be verified on their Aug 2011 Guidelines (see print out in binder). I told her I was suggesting these changes to the policy to comply with CMS, regulatory and good practice guidelines. She told me that she was looking at it from an "educational standpoint" on how difficult it would be to teach new nurses this information. I was stunned! She was saying that she was going to have a hard time teaching new nurses to do a skin assessment within 12 hours of an admission! I told her that most other places had a policy that 2 RN's do a complete head-to-toe assessment and document separately (called 4-Eyes) and that the changes I was proposing were very mild in comparison to what was being practiced at most other facilities. I also told her that it was best practice to do skin assessments within 4 hours on transfer of patients to other floors and back from the OR. [To note, I repeatedly spoke about this with Karen Reeder and Meghan Moore during the first 2 weeks of this job and received complete pushback about the possibility of implementing this]. She (Jen) asked me if putting in definitions of what a wound is versus a pressure injury would be beneficial. This was because I was very frustrated that staff was "hiding" pressure injuries by putting them under a generic wound title and typing into the comment box "pressure injury" instead of using the PI wound documentation (See example in binder from 12/21-includes the H/O patient discussed above). I could tell that Jen was very annoyed that I had made proposed Skin and Wound policy changes (see the old copy and my proposal and the email dated 1/5/2021).

9

Karen Reeder continued cancelling multiple meetings to discuss wounds and HAPI's. I have some of the emails of these cancellations copied.

Several staff members and a couple providers started asking my opinion in these first 2 weeks about wound care (specifically for Caden Smith). I stated that the collagen product that they were using was not going to do anything and that he needed debridement's and removal of any biofilm and slough prior to placement of products. I also suggested hydrofera blue which is the product that was being used at Cincinnati Children's. I was told the surgery NP (Amy Kosanovich) and plastic NP (Jessica Whitlock) were supposed to be seeing the patients needing wound care. Per staff they are hard to get a hold of and are not following through with wound care. To note, see text message by A. Kosanavich on 1/25/2022. Some wounds are not being treated or are seen once and never addressed again. Treatment does not follow best practice as defined by most wound care agencies. This is why I sent emails to various nursing leadership encouraging a standardized wound care process to include weekly photographs taken and weekly treatment goals addressed as per regulatory guidelines. When on the units, the Surgery and Plastic NP avoid me. I have not been invited to be part of their rounds despite meeting them. One day I told Amy Kosanovich that I wanted to see and help her with a leaking g-tube. I accompanied her to the room and assisted. She complained that staff never does what she recommends. I was re-told that the NP's are the only ones that can stage wounds (see the April email) and Jen Isham and Karen Reeder again reiterated that I am only in a "prevention role", yet this has not been disseminated to nursing staff as they are requesting help with wound care. Bedside nurses are still staging yet feel uncomfortable. One said she would be more comfortable if more education was given about how to do it.

10

Meghan Moore has suggested I just sit at my computer for this role and stop getting fixated on staging. The lack of patient wound care and staging with proper treatment is causing more injury to the children and denies them the care they deserve. Nursing Leadership refuses to educate the bedside nurses, refuses to allow me to assist in care of patients and education of staff and refuses to listen to my concerns about regulatory noncompliance. I spoke with Meghan Moore about the importance of educating the PCA's. She brushed it off saying that they are not there long enough to be able to apply the knowledge!! I am being told (by her and also by Dr. Cox) that if I want to educate staff I am to submit my education points to a person so that it can be displayed on monitors in the breakrooms, no 1:1 talking.

I began insisting on doing skin audit rounds (aka active surveillance) to the high-risk patients on Wednesdays with the bedside nurse so that I could assess their comfort level and do real time education. There has been extensive pushback especially from Cheri Skiles in the PICU (see email exchange on Jan 5th). I have had complete push back on formulating a proper skin audit process (this is the data that is submitted to regulatory bodies). There are suggestions in the SPS bundle, and I am being told I must take the process to nursing "leadership" if I want it changed. Right now, it consists of the unit education RN's from each floor completing the audit. Sometimes the educator does this independently. I want 2 RN's to do the skin check aka "four eyes" and this is recommended by SPS and Evidence Based Practice (EBP). The data collected is then given to the Clinical Nurse Specialist to scan to Lisa S. who then enters the data with Ameena. This process if full of holes and subject to data that can be missed regarding patient pressure injury wounds. (See email dated 12/28). See the process of audits (active surveillance) as defined by SPS in Operational definitions page 4 section IX – they recommend a "team led by

11

a PI champion, beside RN, certified wound ostomy nurse and may include RT, MD/CNS, PT and quality leader". I have the audits that I completed for 1/5 attached to this audit.

See email exchanges on 12/21 with Michele Michener and a second email on 12/21 which was also included to Jayne Gmeiner in which I discussed the problem of putting in the etiology of a wound when entering it into EPIC. My concern was on a patient named Erroll Muslar MR # 474936 in the TCU. I noted that there were discrepancies in his documentation. His "surgical wound" was actually a pressure injury with debridement. Debridement is not really a "surgical" procedure and there is a whole regulatory process around this.

In a 6-month retrospective research of patients with PI's, while doing a root cause analysis (RCA) of problem areas, I printed off the SPS Excel spreadsheet of patients from June 2021 to Dec 2021. I went one-by-one and looked up each patient by their MR number. In EPIC I would go to their LDA (line,drain, airway) and note the time/date entered, I checked to see if there was a description of the wound and if there was a stage entered on first finding the PI. I then looked for a picture in the media tab. Then I looked at some (not all) of the MD/Provider notes to see if the wound was acknowledged and treated. Finally, I looked to see if assessments were completed and if the wound was closed, healing or left open in the chart with a final picture. This is all regulatory!

On many of the wounds I found that staff had put in a wound under the pressure injury wound assessment, but all the properties were not completed. Patients with pressure injuries had an LDA entered labeled "wound" and the work around was free texting "pressure injury" or "unknown cause" in the comments box or other vague details to avoid detection. (I expressed

12

my concerns about this issue see email from Melissa Michener 12/20 and Janell Stang with Matthew McKeever 1/11/2021). Many of the PI's were removed from the PI LDA and relabeled under a generic wound assessment (one blatant one was done on the same day about 1 hour apart see Excel sheet MR # 1036535 Ezra Estep, MD and NP aware = medical team involvement in cover up?) which would take the child off the radar of surveillance for HAPI's. In fact, one of the physicians involved in the care was Dr. Whitney who is/was the HAPI HAC Chair. In running a wound report daily over the last 4 weeks, I have found staff doing the same thing for other patients who are not being reported to the PI list for SPS. (See my email 12/20, 12/ 21 and to administration 12/28, Skin Policy email 1/5) which addresses my concerns. I specifically repeated that we are not following CMS requirements (Can look at patient lists from the days I worked in December because I would run these reports every day). Some of the wounds were staged at one assessment and then down staged at another. This is illegal in the realm of wound care. This is not new see NDNQI 2011 form.  In reporting on SPS some of the wounds reported had no stages documented in EPIC or in provider notes!!! How can you report a staged wound with no pictures and no staging in the assessment in EPIC?

One name that I saw associated on many of the charts about the same time as changes were made in EPIC was Cheri Skiles. Karen Reeder was also a name I noted on some of the charts when documentation was altered. Others included many PICU staff.

In a meeting on 1/ 12 when I questioned the documentation in the EPIC care section for turns that has the option: "patient unable to be repositioned- pressure points offloaded" I stated that a doctor's order was needed to document this. I reiterated that it was not physically possible. I

13

also emailed Lisa Scherbauer asking where this had come from as I had never seen it in EPIC. She told me to ask Karen Reeder. I reached out to a nurse expert at Advocate Children's Hospital Mary Fowler and she said she had never seen that documentation before. Off-loading pressure points in this context is physically impossible due to the fact that pressure points are the head, heels, buttocks, elbows and back and unless the patient was levitating there is no way that that documentation charted for a 12-hour shift would be acceptable. There is no medical condition that a patient cannot be turned in some little way. She said that we do not have orders to turn the patient every 2 hours, so she saw no problem with this documentation. Please refer to NDNQI 2011 document to see this has been a requirement for a very long time. I reminded her that the scope of nursing practice was to turn compromised patient's every 2 hours and no order is needed to practice in the scope of nursing practice. I am told that she had this documentation authorized under nursing leadership to add to EPIC. I had to have this same discussion with Meghan Moore and Bryan on 1/18 (see my email synopsis).

1/12 I had a meeting scheduled with Jen Isham at 9 am but I cancelled because I felt that she was going to try to prep me prior to talking to Dr. Cox. Jen had cancelled my meeting with her the day before and I anticipated the strategy. My meeting was at 10 am and I met with Dr Cox and her. Jen had invited Karen Reeder which very much upset me because I had not asked that she was to be involved in this meeting nor was she on the original invitation. Someone added her later. I stated that I felt "overqualified" for my position (as Karen Reeder had stated this to me in my third interview) because no one was listening to me about proper wound care regulations. I told Dr Cox that nursing charting had to reflect MD care surrounding wounds and PI prevention. I specifically said that if we follow CMS requirements then SPS Bundle

14

recommendations and compliance would be easier to achieve. Dr Cox agreed and mentioned a PI case at the hospital in which a RCA had to be done that she did not want to do that again. I emphasized the importance of compliance with entering wounds into EPIC in a standard way that would reduce errors and confusion this included taking pictures on discovery and weekly along with following a treatment plan. Dr Cox mentioned that they were a small hospital with rotating residents and communication of this might be challenging. She said that the hospital was looking into getting Hauki/Canto on all the MD phones. She also joked and said communication and connection issues happened and so it was not always reliable. I know for a fact this is an easy process as it is on the i-pads in each unit! I was shocked she used this excuse as there are other small hospitals that are using the technology without issue. I also met with RN IT staff on 1/11 to go over my concerns regarding charting see email from Matthew McKeever 1/12. I discussed my concerns about "downstaging" wounds. I used the example of the patient on the SPS data form R.W. MR # 1117926 who was staged a I and a II alternating in the flowsheet. I brought up the discussion about the "patient unable to reposition-pressure points offloaded" option mentioned in the above situation and Karen Reeder vehemently defended the documentation. Dr Cox and I both gasped at her while trying to correct her. She continued to gas light me in this meeting saying I was lazy and did not appear to want this position as the PI Nurse and that I stay at my computer all day (note Meghan's suggestion from previously). I rebutted her and told her that she was supposed to be orienting me and she kept blowing me off by cancelling meetings and literally physically avoiding me. She then told me I was still on orientation and may have to be on orientation for a year!!

In this meeting, Jen Isham said she wanted to me to stay on at DCH. I mentioned over and over in the meeting that I did not think I was qualified to be in this role at DCH as I was too experienced for what they were requiring. She said that she wanted me to meet with her later that day. I met with her at 1:30 pm. I told her I was considering resigning due to all the red tape that I was running up against. She acted caring but I knew that she was behind much of the red tape I was talking about. I told her that the tortoise system being used in the PICU is not a "specialty bed" as Karen kept trying to say to me. It is a repositioning device. She repeated over and over that she wished I had not cancelled the meeting with her in the morning, and I could tell she was a little distraught that I had discussed some of the issues in front of Dr Cox. I got the sense that Jen was/is trying to control my role and responsibilities passively aggressively. I left the meeting by telling her that I was going to think about resignation and let her know when I returned.

In between my 10:00 meeting and the 1:30 meeting, I was called by a nurse in the PICU to come and help with a skin check for the weekly skin audit (aka active surveillance). It was on the conjoined twins in the PICU (Tut Xol's). I had the bedside nurse with me and while we were checking the skin the nurse asked me, "I just want to clarify your role. You are not allowed to assess patient's and stage above a II correct?" I thought it was a very odd question to be asking and verified that I was told I cannot stage a III or greater. Shortly after and while we were still in the room Cheri Skiles came in and the nurse said, "I did not know how long you were going to be, so I just called someone else".  She said to the nurse. "Oh, good you found someone to do it with". Meaning she found someone to do the weekly surveillance with albeit this is what I had been asking the leadership team about since the beginning! Cheri then noted it was me and her

16

demeanor completely changed. She had a visible shift in her behavior and the nurse again asked about my qualifications to stage a pressure injury. Cheri said, "She cannot stage anything II and above". I looked at the nurse and said, "Listen to whatever she says. She knows." Cheri also assigned me a specific Vocera badge and told me that it could be tracked anywhere in the hospital, and she had access to the program to locate it (me). I took this as a threat that my movements were going to be monitored.

After leaving this day and due to the incessant red tape, the push back, lies, passive aggressive behavior and the blatant disregard for government regulated guidelines and patient safety along with the lack of concern from senior nursing staff I filed reports:

1/13 I filed with the Office of Inspector General (confirmation in paperwork) 1/13 I filed with the Ohio State Attorney (who called 1/14 and said to notify JACHO as they do not work with Pressure Injury claims)

1/15 I filed with JACHO ( safety event number in documentation)

### Violations include:

Noncompliance with regulatory CMS guidelines for wound care with proper identification, treatment and follow up

Falsification of data submission to SPS (solutions for patient safety) and NDNQI

Gaslighting by multiple nursing leadership staff to me for surrounding my legitimate concerns

Lies surrounding hospital policies and procedures

17

Failure to have identified staff education and re-education of wounds/PI's etc in place

Neglect of proper equipment (specialty bed for paraplegic and bariatric patients)

1/18 at 10:45 I went to New Employee orientation where I was told by Mindy Hilgeford (see email 1/3/2022 that education was given for PI's to onboarding staff. I have been asking about providing education on staging/wound care and pressure injury prevention I was told this is where it is done. It was a discussion on the "culture of safety" and the PI education was less than a 3-minute snippet done by Karen Reeder!!!

I next had a Teams meeting with Meghan and Bryan. See email exchanges about changing the Braden Q. We met for an hour over teams even though Bryan was in the building, and I had set up a meeting for Conference Room A on the 8th floor. I once again asked why the Braden Q score was set so high ≤22 and if there were any "incidents" around it. Bryan said he thought it was because there were PI incidents in the past!! This was not elaborated on, and Meghan immediately wanted to be part of the process with Bryan and I in discussing the issue.

Addendum to Original Affadavit:

On 1/19 I sent email response about the meeting the day before in which I reiterated I wanted to know from leadership why the Braden Q score was so high and what the past incident was in 2018/19 that lead to a RCA. I also stated in this email that I was the EXPERT in wound care and pressure injury prevention and listed my credentials again. See email from 1/19. I received an email from Jen immediately wanting an appointment at 8:15 am. I met with her and discussed my comments last week about "not being the right person for this position" when we were in the meeting with Dr Cox. I told her I was seeking other employment options. She discussed her dreams for what she envisioned for my position in the future. It was more working to help the audit teams and relay concerns to the wound care NP's but still not allowed to stage or participate in any wound care. She asked me if it was "personality conflicts", I told her "no it is legal issues" especially surrounding documentation and government regulations and an unclear job description. She offered to have me meet with Jayne G. and Chaz the Hospital lawyer. I agreed. When I got back to my desk, she had emailed that Jayne G. wanted to meet with me alone with her (Jen) before I met with the hospital lawyer.

1230-Met in Jayne's office with Jen. Jayne started out by saying how much she and Dr. Metzoff were champions of patient safety. She went on for about 5-10 minutes. I could tell she was concerned about safety because to get into the Executive Suites I had to ring a doorbell and someone had to come unlock the door to let me in. I then discussed my concerns about documentation changes in Caden Smiths chart surrounding wounds on the SPS reporting system and in EPIC. (See my notes on the SPS excel sheet) Jayne started turning everything back

19

on me asking me what I was doing regarding "prevention". We discussed the lack of availability of specialty beds including ones for bariatric patients like the COVID patient Z.O. that died in the PICU. I said he should have been on a bariatric bed. Jen talked about the hospital ordering 5 new beds at capital budget time which Meghan had mentioned in the 12/23 meeting. (These beds can be rented!!! Tammy Witwer told me it was too expensive!!) I also said that I had made recommendations about Caden, and he too should have been on a specialty bed specifically a sand bed. Jayne G. called Hila C. who came right up to discuss the SPS issue. She had no answers and just took notes. I asked why the Braden Q scoring was so high and what were the surrounding circumstances (incident from 2018 or 2019) and the Root Cause Analysis (RCA). Jayne became very frustrated and said she knew of no incident that a RCA was done (contradicting what Dr Cox had told me last week). Hila and Jayne both started saying that it was at 22 ever since they can remember but neither of them worked on the floor at DCH. Jayne cut the meeting short due to an appointment at 1pm. I left. I turned off my Vocera badge (as I know they are tracking my moves). I went out to the parking garage and sat in my car and made some phone calls. One of which was to Eric Deters.

I suddenly got a text on my personal phone from Jen asking for a follow up appointment at 9:30 am on Thursday. I know she was texting because they saw I was off the radar with my Vocera badge. She never texts me. (See screen shot) I said I could not make it Thursday morning. She scheduled it for 4:00pm on Wednesday (that same day). At about 3:15 I got a cancellation notice of the meeting. To note: Also received an email form JACHO at the same time saying they received my report. Then at 4:00pm I got another invite that the meeting was rescheduled

at 4:15 pm. I went into Conference Room A 8th floor and called into the meeting. I was also logged onto the computer so I could access the SPS excel sheet and EPIC.

Jayne started off by saying that she did not want to leave me without answers. Hila and Jen were also on the call. She said that Jen would update me on the bariatric bed situation for Z.O in the PICU. Jen said that he was only 111 kg and that the bed he was in was appropriate (I confirmed he was 113kg). She said he was so critical that movement was impossible (blatant lie) when he came into the PICU he was still able to stand up and get OOB. I first saw him sitting in a chair. When I did skin audit rounds the last week before he died, there was an order not to change linens, but I told the bedside RN to get an MD order to not turn as they were not even slightly repositioning him. The bedside nurse said that pillows and z-flows would overheat him, so they were not even adjusting him a little!! Jen continued and said that Cheri Skiles had spoken to the mother (after the patient died) and the mother spoke specifically about how good his skin was during his entire time at the hospital and how she was happy they took such good care of his skin. I find this odd as the child died and this is what the mother wanted to discuss?

Hila talked about the wound entered in Caden's chart and started addressing the urinary meatus wound NOT the coccyx wound. When I tried to redirect her, I read exactly what was in the SPS excel sheet: "Present on admission. Staged as a stage II within 24 hours of admission. All providers, wound care team classify as a stage II. One RN documented a Stage III. Although, providers the next day classify as a stage II. This should be reported as a stage II. Pictures in media tab (Karen and Meghan input)." Hila told me that it was entered incorrectly and was

21

supposed to be about the urinary meatus PI. I was flabbergasted! I then went into EPIC and saw that the coccyx PI wound had been closed aka as "deactivated" at 15:50 this day 1/19- just moments before our meeting!! I immediately took a picture with my phone to prove I was on the call with them and looking at the charting at the same time.  See email with photos, including the fact that there was no "healed"" photo and the last photo taken on 12/15 actually appeared significantly worse that the one on 11/15. I said, "Well look at that his wound was closed today". Hila would not address the coccyx wound as she and Jayne started talking about his scrotal edema which caused the urinary meatus PI from the catheter. Jayne deflected all my concerns. I also stated that according to SPS a PI is reported at its highest stage. There was dead silence on the phone. Hila knows this as she told me in an email that she has been with SPS since the inception at DCH (see email dated 12/17). They then suddenly started talked about how "difficult" of a patient he (Caden) must be because of his challenging medical conditions. There was NO discussion about the removal of his coccyx wound in EPIC!!!

Finally, Jayne in a very passive aggressive way asked, "So Bridget do you have any more legal concerns?" Stunned I could not even answer. She said, "You must have cut out. I can't hear you". I said very briefly "Nope". Then she said, "And how about regulatory issues? Do you have any more concerns?" I again hesitated for about 15 seconds because of the tone of her voice and the attitude of the question. She said "I can't hear you. You must be in a bad reception area. What did you say?" I briefly said "nope". I did again mention the inconsistency in documentation of wound assessment and staging.

She changed the subject and started asking me in a passive aggressive way again, how I can be helped with "PRESSURE INJURY PREVENTION" role. I realized where the conversation was going and that they were telling me to stay out of the wound and staging component of this role. They were all complicit. I said that there was nothing else I needed. The call ended.

1/20 I updated my report to JACHO and discussed how administration was aware of the issues and about our meeting. Names were given.

1/25 I had ANOTHER meeting with Karen Reeder and Meghan Moore (was taped by myself) in which they are pressuring me to change the Braden Q scoring down to limit "high-risk" patients. To note, it was mentioned in this meeting that Hila Collins will be making ALL decisions about this change and will be the "leadership" approval if the Braden Q will be changed. I also found after a deep investigation into patient Ben Pohl on the SPS excel sheet from 3/16/2020 questionable assessment and treatment of a gluteal wound (PI). Abby Riedel treated this patient, and his wound is obviously unstageable and definitely a PI but was entered as a Stage II. I have a suspicion that Abby Riedel was instrumental in "hiding" PI's just by what is written in this patients' consultation note. A wound care expert would not have staged or treated this wound as she did. I am concerned that the hospital "fired" her and yet she has an unencumbered nursing license and still practices as an APRN. Also, Caden Smith still has a closed wound (from 1/19) in the flowsheet of EPIC but per MD notes is still being treated for a coccyx decubitus. It is also being documented that he is "Unable to reposition-pressure points offloaded." This was the EPIC charting that I had repeatedly spoken out against as it is not to be an option for an immobile paralytic.

23

Tuesday 1/25- Had a Teams meeting with Meghan Moore and Karen Reeder in which we discussed changing the Braden Q score. I video taped the meeting and uploaded it to my Google Drive. Here are the highlights. Meghan started out by speaking about the capital budget and the 5 beds. I reminded her that she had spoken to me about this issue last month (actually we had had multiple meetings about this). She notified me that leadership is now wavering on when capital budgeting is due- meaning these beds are not going to be exchanged anytime soon and they do not have the proper surfaces for patients. In the meeting on Wednesday with HillRom to discuss this, I found out that there were only 8 progressacare beds (these are ICU specific and are supposed to be available for all 25 beds of the ICU) and that the Total Care Beds that DCH has been using is 20 years old and no longer a model that is even made. The last bed purchase for the hospital was in 2014. Overlays and replacement mattresses have not been purchased! In the meeting on Wednesday, Meghan also spoke about not wanting to get another model bed because she did not want to "train 400-500 nurses on 5 new beds". The rep from HillRom discussed how they had apps and tools to help with education and discussed the fact that it is a JACHO requirement to have all staff educated on the proper use of the beds. There was dead silence on the phone as this is not done at DCH. This all relates to changing of the Braden Q because it is part of requirements for various components of the scoring and JACHO.

Meghan then said that Bryan Gannon (who has been involved in meetings before) approached her and Karen about the Braden Q score being set at 22 which is higher than the average. This is incorrect, I spoke to Karen and Meghan when I first assumed this role as was asking multiple times why it was set so high. This was also the subject of conversation in the meeting with

24

Jayne, Hila and Jen. Karen started suggesting to change the Braden Q scoring tool to the Braden QD. I have been opposed to this because it would require staff education and Karen and Meghan do not want to roll out education. I have met extreme resistance on any new staff education for anything including the Braden Q which is already in use. I have not been given a itinerary of the current yearly education for Braden Q or PI prevention. They do not have this! This is also a JACHO requirement! I specifically asked Karen if the NDNQI data is the same as the SPS requirements and how changing the Braden Q would affect that process. Karen specifically denies this!! I had in front of me NDNQI Guidelines for Data Submission and Collection on Quarterly Indicators from 2011 and the requirements are the same!!! Once a month every patient in every unit must be assessed and audited and this information is sent to NDNQI. Karen states NDNQI is only reported on high risk patients. This is not so, it is supposed every patient. So yes, the data would be affected if we changed the Braden Q scoring! Meghan specifically asks Karen if the NDNQI asks about turning Q 2 (Minute 11:45 in audio)and Karen says "NO"....See sheet from 2011!!! This is a requirement and has been a standard of nursing care for decades!

During the conversation, I deflected when asked about the Braden Q score being set at 18 and less stating that it would be Hila Collins who would make the ultimate decision about the scoring change. Meghan ultimately agreed that she (Hila) would have a say in the conversation and that nursing leadership which included nursing directors and Jayne would have the ultimate say in the change.

Karen then discusses her desire to change to the Braden QD. This is a real concern for me because as I have already seen we are not using the current tool which has been tested and is reliable, correctly. I specifically read to Karen and Meghan (minute 18:10) a comment on SPS stating that when the Braden QD was introduced at CHOC (Children's Hospital of Orange County) that there was aggressive staff education initiative and it took 2 years for staff to feel comfortable reliably using the tool. I also mentioned that yearly staff education was vital. As this is not being done currently at DCH for the tool we already have and because Meghan and Karen have resisted all attempts I have made to do bedside rounding with the nursing and staff education, I continued to express my reluctance in this meeting. Meghan states at minute 22:19 that it is "easy to push out education". The meeting finished by Meghan delegating me to contact Lisa S for data to support this change in the Braden Q scoring.

1/26/2022 Skin audit Wednesday. Arrived at work at 6 am. Started looking through an email from Lisa S. in regard to PI's reported to SPS for 2021 that have not been device related. This was requested by me after my meeting with Meghan and Karen yesterday 1/25 and to verify data to change the Braden Q scale to make 18 the high-risk number. Reviewed the SPS excel data sheet for January (see printed copy). Noted that C.A. MR# 736901 right ankle PI was entered as a stage I. I know for a fact that this is incorrect as I found this PI while doing skin audits and it had opened skin so was a stage II. (See SPS copy).

I started looking through the SPS excel sheet of non-device related PI's. (See printed copy with notes). In doing a chart review of I.C. MR#933051, J.C. MR# 539807 and R.M. MR# 1058904, I once again found a plethora of fraudulent and deceptive documentation including

26

missed/absent staging, no pictures, and no assessments of PI's. Provider and nurses' names that were common on these charts are Karen Reeder, Cheri Skiles and Beth Bourquin (NP). Amy Kosanovich wrote in J.C.'s chart "continue turning at least every 3 hours"! (Please see NDNQI 2011 sheet from yesterday which states that turning should be a maximum of every 2 hours). I received an email about 7:15 regarding PICU skin audit rounds ( see email exchange) to note I have a screen shot of the TCU & PICU census. Out of 25 PICU beds they only had 8 patients. Per SPS all patients were to be included in the skin audit. TCU had 8 patients also. I agreed to doing the skin audits with the bedside RN's. I insist on this to see where educational gaps are. I was able to finish 4 of the 5 skin audits. I saw the patient T.G MR#638759 who had a large trochanter PI on admission. See photo print out and notes on her audit sheet. It had been a very large PI and was in the healing stages and so I looked through her chart to see if I could find a history of this wound- The chart appeared to be wiped of any information surrounding this wound! No MD notes regarding it. No treatment. Nothing. I suspect that either my view was limited by IT on this chart or that it was wiped. She is a Dayton resident and has encounters to the ER on 7/2/2021 and 11/20/2019. Her last admission was 10/3/2018 for osteomyelitis of the right foot due to a PI. Amy Kosanovich literally found me outside her door at 0850 (assume Cheri or Karen called her to tell her I was on the floor). Amy said to me, "See what you think about her wound and text me any recommendations and I will put in orders." Then before entering the room the bedside nurse told me that the patient had come in "caked in dirt which caused the sheets to be black" but the night nurse had cleaned her up really good and even painted her nails!!! PICU nurses NEVER paint patient's nails!!! Not critically ill newly admitted

kids! See all the notes on the audit paper. See my last email exchange for the day at 5:46 when I respond to Karen's questions about this patient.

At about 1200 I sent an email confirming completion of the audits I could do in PICU and decided to turn my attention to the TCU. I wanted to get into see Caden Smith who was the patient that had his wound removed in EPIC per Jayne G. To note MD notes still were saying that wound care was being done. I notified each nurse that I was available for their rounds and needed to do the audits. I had complete resistance from Tammy Dammeyer (as I had on 1/5 when doing skin rounds) to audit Jamie Reynolds MR 769501. This is a child who had a catastrophic outcome from a simple spinal rod placement and ended up with a perforated bowel. I was never able to complete her audit as Tammy refused to call me when she went into the rooms. To note Tammy was on the Skin Champion Team. The nurse for Caden Smith was Kathleen O'Brien. Ironically, she is a PICU nurse, and I had never seen her up in TCU until this day. At 1:20 she called me via vocera and said she was going into Caden room. I said I would be right there and proceeded to his room. When I got to the room, she said he had refused the turn. She said that he typically received a suppository in the evenings, and I would be able to look at his back closer to 6pm. See the PT note at 230 which states that the RN told the therapist she could wake him up to do PT! I told her that was fine because I would be there till 6. I had to be on a bed meeting from 2-3. It finished late. I came out of the meeting and told the nurses who were all sitting at the desk that I needed to get the audits done. I went into two of the patients' rooms and while I was in one of their rooms Kathleen O'brien gave Caden his suppository at 1552. She did not call me or notify me. I went to the back nurse's station and sat outside waiting to see when she entered the room. I saw her enter the room at about 1700 and

28

I went to the door and asked if he needed help turning and she once again refused care for him. I stayed until 5:45 and she continued to evade and ignore my attempts to do his skin audit. She knows I would have found his coccyx wound still open!!

At 5:45 I sent the email to Karen (see email). I turned off my vocera and left my desk. I went to a computer in the library and tried to gather more clinical information but was kicked out of EPIC about 6:10. I left work.

Further, affiant sayeth naught.

Bridget A. McGinley
Bridget McGinley

COMMONWEALTH OF KENTUCKY )

) SS

COUNTY OF KENTON )

Subscribed and sworn to before me, a notary public for the Commonwealth and County aforesaid on this 16 day of February 2022 by Bridget McGinley as her own free and voluntary act and deed.

Loretta Little
Notary Public
Commonwealth-at-Large

My commission expires: 12-5-23

LORETTA LITTLE
Notary Public-State at Large
KENTUCKY - Notary ID # 635972
My Commission Expires 12-05-2023

29

# EXHIBIT B



# State of Ohio Board of Nursing

*www.nursing.ohio.gov*

17 S. High Street, Suite 660 • Columbus, Ohio 43215-3466 • 614-466-3947

## COMPLAINT FORM

**All complaints are kept confidential pursuant to Section 4723.28(I), ORC and are not a public record.**

Instructions: You may download this form, complete it on your computer, save it as a Word document, and e-mail it as an attachment, to complaints@nursing.ohio.gov. Or you may fax the completed form to 614-995-3686 or 614-995-3685, or send via regular mail it to the Board's Office, Att'n Compliance Unit, at the address listed above in the letterhead. If you have questions, please call 614-466-9564.

Under HIPAA, the Board is a health oversight agency to whom release of PHI is a permitted disclosure without patient authorization. 45 CFR 164.512(d).

### *Complainant Information*

Date __1·31·2022__

Name of person filing complaint and Title/Position (if applicable) __Bridget Ann McGinley RN__
__WOC Nurse/ Pressure Injury Prevention Nurse__

Home Address __1541 Sleepy Hollow Rd, Apt 5: Fort Wright, KY 41011__
Include City, State & Zip

Home Telephone __484-347-7858__          E-Mail Address __mcginleyrn2000@gmail.com__

Filing on behalf of an agency or facility? ☐ Yes ☒ No  (If yes, please provide information requested below)

agency/facility name _____

agency/facility address_____
                Include City, State & Zip

agency/facility telephone _____ Your E-Mail Address (at facility) _____

### *Complaint/Incident Information*
*Please provide as much information as possible. The Board understands that you may not know all of the information.*

Name (of the person you are reporting to the Board) __See attached Sheet__   Date of incident __Dec 7th 2021 to present__

Home Address _____
        Include City, State & Zip

Home Telephone #_____          E-Mail Address_____

Please check
☒ Advanced Practice Nurse (CNP, CNS, CRNA, Certified Nurse Mid-Wife)
☒ Registered Nurse          ☐ Licensed Practical Nurse
☐ Dialysis Technician       ☐ Community Health Worker
☐ Certified Medication Aide ☐ No License or Certificate

License or Certificate No. _____   Last 4 SSN _____   D.O.B. _____

Employer __Dayton Children's Hospital__ Date of Hire _____

Employer's Address __1 Children's Plaza Dayton, OH 45404__
            Include City, State, & Zip

①

## *Complaint/Incident Information Cont'd*

Has the information reported in this complaint been reported to another agency or law enforcement authority?

☒ Yes ☐ No  1|13|2022 Office of Inspector General (OIG)
1|13|2022 JACHO

If yes, please specify and list the contact person ___N|A___

Was the nurse/dialysis techician/community health worker/certified medication aide terminated from employment due to this incident? ☐ Yes ☒ No

If yes, please list effective date _____

Please provide below a brief description of complaint or violation, including names of witnesses and/or victims: (please type or print neatly) **Please send all related documentation and witness statements confirming the violation.**

_____  See attached forms

**Please Note: if you are an employer and are reporting a nurse who has been involved in a practice breakdown (including but not limited to documentation issues, failure to follow physician's orders, failure to assess a patient, failure to perform treatments, and medication errors) please complete the Supplemental Information Form (available on the Board's website at www.nursing.ohio.gov.**

*Please provide names, addresses and telephone numbers of witnesses below:*

**Witness #1** _____
    Name

    _____
    Address line 1

    _____
    Address line 2

    _____
    Telephone # and/or e-mail address

**Witness #2** _____
    Name

    _____
    Address line 1

    _____
    Address line 2

    _____
    Telephone # and/or e-mail address

**Witness #3** _____
    Name

    _____
    Address line 1

    _____
    Address line 2

    _____
    Telephone # and/or e-mail address

**Witness #4** _____
    Name

    _____
    Address line 1

    _____
    Address line 2

    _____
    Telephone # and/or e-mail address

②

To: Ohio Board of Nursing

From: Bridget McGinley, RN BSN

I am a registered nurse of 22 years (this May) with a bachelor's degree in nursing. I have primarily worked pediatrics and have a certification in pediatrics (CPN). I obtained extensive wound care training by attending the R.B. Turnbull, Jr MD WOC Nursing Education Program at Cleveland Clinic in 2019. I acquired wound care certification in April 2019. I worked for 4 years (2 years PRN and 2 years full time) at St Elizabeth Hospital Wound Care/HBO Clinic. I also had extensive training when I attended a weeklong HBO course held by Healogics in Jacksonville, FL in 2019. I began working for Dayton Children's Hospital in July of 2020 in the South Campus ER. I accepted a transfer to the WOCN nurse position and started this role December 7th at Dayton Children's Hospital Main Campus.

Since starting the WOCN/ Pressure Injury Prevention Nurse position (Job description can be provided) at Dayton Children's on December 7th, 2021, I have noted extensive fraud, negligence and deceit in documentation, diagnosis, treatment and follow up of pressure injury wounds that the children have had either prior to admission into the hospital or when it was acquired in the hospital. I have noted a deliberate evasion, especially by nursing administration, to deflect any wound care or staging to my role despite being the **only** certified wound care nurse in the hospital. I have notified many of the senior nursing leadership team of my concerns surrounding CMS and JACHO violations specifically surrounding wound care/pressure injury prevention and staging of wounds and will henceforth describe these interactions in detail. I have told by my director (Jen Isham), Chief Nursing Officer Jayne Gmeiner and Clinical Nurse Specialists (Karen Reeder and Meghan Moore) of my concerns.  My only job at DCH repeated over and over by them is that I am only qualified to provide "Pressure Injury Prevention care and education" NOT wound care or staging of a pressure injury greater than Stage I. I have offered to educate staff as per my job description and my offers have been deflected. To date I have not been allowed to do any staff education.  There have been deliberate attempts to change my job role and I have been given 3 different job descriptions (enclosed in binder).

Pressure Injuries are considered a hospital acquired condition if  they develop in the hospital and if obtained during hospitalization will not be covered by Medicare or Medicaid services as of 2008. A stage III, IV or unstageable pressure injury is considered a sentinel event and is reported by the hospital to regulatory bodies. I have see false stages entered, downstaging done and pressure injuries not even documented or documented in a generic "wound" section and "pressure injury' or some other vague description put in the comments. This will take the PI off the list that can be run in EPIC.

I started my new role on December 7th, 2021. I was first taken to a meeting to review PI's that were being placed on the reporting sheet from November 2021 to submit to SPS (Solutions for patient Safety). Karen Reeder, Meghan Moore, Ameena and Lisa Scherbauer were in attendance. Some of the wounds had pictures and I was asked my opinion of the staging.

Immediately I could sense that staging was a concern to everyone. One patient who was in the Heme/Onc unit had a sacral PI but was not staged properly. I stated that it appeared to be a stage III due to open skin and drainage in the picture but I reiterated that I would have to see it in person to make an official assessment and staging. I was never allowed to see the patient in person. Meghan and Karen glanced at each other multiple times during this meeting and there was tension in the room. This patient is, as of today, not on the SPS report list for November. She was removed. In looking at her chart, she had a PI wound changed to wound-coccyx "avulsion" on 11/17. APRN Amy Kosanovich saw her for wound care. During the meeting Karen and Meghan questioned me over and over about the other patients. I saw that there was documentation, assessment, and staging errors. I immediately sensed evasion and deception.

During this week, I kept hearing bits and pieces of rumors about Abby Riedel who was the Wound Care APRN prior to me that had been "fired" but no one would give a clear explanation. I also started to get more firm insistence from Karen that my role was "Pressure Injury Prevention only". At one point when I was asking questions about some of the documentation errors, she stated that if I wanted to be "successful" I should probably just focus on pressure injury prevention. I was stunned as my job role per the description was Wound Care and Pressure Injury prevention.

I read a report from another Children's Hospital (Key Drivers in Reducing Hospital-acquired Pressure Injuries at a Quaternary Children's Hospital-see printed copy) to help me understand Solutions for Patient Safety Standards. Hila Collins, APRN and Quality Director (and also the overseer of SPS reporting) literally told me to "be careful" in my reading when I emailed her questions about DCH numbers. She stated that she had the "advantage because she had been with SPS since the beginning". She then told that since October 2019 the HAPI rate was 0 at DCH. I knew that was impossible because of what I was seeing in the charts. I have documentation and emails to support all of these accusations.

Karen Reeder has kept insisting since my arrival to this position that there is no "requirement" to turn patients every 2 hours that area immobile. She and I have had multiple conversations and email exchanges about this due to the fact that she had a button inserted into the turning section of EPIC charting that says "Patient unable to turn-Pressure points offloaded". I have seen this documented for entire shifts and have repeated over and over that this is illegal to document. Karen Reeder and Meghan Moore have both gaslighted me into saying that NDNQI does not say that you have to turn patients every 2 hours ( I have a recording of this conversation).

In the 2 months I have been int this role, I have been shocked at the lack of proper wound care and the deception. I have filed a report with JACHO and OIG. On 1/19 I was called into a meeting after demanding answers to reporting on the SPS excel form that was altered on a patient ( I have patients names and medical record numbers). I met with my director (Jen Isham), Chief Nursing Officer Jayne Gmeiner and Hila Collins. In this meeting, they literally had a nurse Tammy Witmer delete a patient's pressure injury in the LDA section of the charting, despite the wound NOT being healed (the doctors are still documenting wound care) and

basically told me to stop complaining about the charting and the evasion and fraud I was seeing. I have many other stories. I also have grave concerns about the "Wound Care NP's".

I have GRAVE concerns about patient safety, the fraudulent charting I am witnessing and the bullying and intimidation tactics I am privy to. I have emails and further documentation to prove that my concerns are validated and can share them with an investigator. I also have pictures, audio, and emails that are relevant. JACHO has responded that they have received my complaint but to date I have not been contacted. I ask the the Ohio BON immediately take measures to ensure patient safety.

Thank you.

Bridget McGinley RN



U.S. Department of Health and Human Services
## Office of Inspector General

# Requesting information about your complaint

Every report we receive is important, however, not every submission results in an investigation.

Once submitted, we will review your complaint for relevance and completeness. If you have identified yourself, a reviewing official may contact you for further information. It is important to note that you might not be contacted by an investigator but that does not mean your complaint is not being investigated. Due to the high volume of complaints we receive, it is not possible to contact every complainant. The Hotline will not be able to confirm receipt of your complaint or respond to any inquiries about action taken on your complaint.

You may request information about your complaint through the OIG Freedom of Information Act officer (https://oig.hhs.gov/foia). Remember to phrase your request in terms of a search for records pertinent to your complaint, not status. You should wait at least six months before filing such a request.

# Your complaint summary

Before you submit, make sure you check your information and save or print a copy for your records.

## Allegation details

-

**Cell phone**
-

**Work phone**
-

**Personal email**
-

**Work email**
-

**Home address**
-

## Employment information

**Job title**
-

**Employer**
-

**Address**
-

**Employer phone**
-

# Your narrative

## Your description of events

:

Abby Riedel was an NP working at DCH and was fired early last year 2021. No one will tell me why. She is wound care certified. I was hired as a wound care RN in Dec 2021 and have found the last 6 months of wound documentation altered and changed (such as pressure injuries not staged, treated or documented by MD's, and no pictures) to avoid detection by regulatory organizations. I have medical records for patients up to 6 months ago which can confirm this. There have also been pediatric deaths surrounding some of these patients. "CMS" has visited the hospital in the past due to this issue, I was told but not given details. I have informed nursing leadership of the compliance and regulatory violations and I was told to ignore it if I wanted to keep my job.

I have an excel spread sheet of patients. I have names of administration involved and I have the name of a recent patients mother who filed a complaint with CPS because she believes her baby was burned in the NICU which I could not rule out in my professional opinion but was told I was not to document on anything.

**Attached files**

**Evidence description**
I have an excel spreadsheet printout of medical record numbers going back 6 months ( but I am sure it is longer) of patients whose hospital-acquired pressure injuries were falsely documented or after documentation was done it was altered to reflect that they were less severe than they really were. I know that the physician staff is aware of violations also and have been bullying nursing to keep quiet.

# Your information

**Your consent to disclose**
I wish to remain Confidential. You may contact me for additional information, but please keep my name confidential and do not share it outside of the HHS Office of Inspector General. I also understand that HHS-OIG may still need to disclose my identity if required by law or if deemed necessary to the investigation.

**National Provider ID (NPI)**
-

**Address**
1 Children's Place
Dayton, OH 45404

**Business phone**
-

**Alternate phone**
-

**Website**
-

**Additional identifying information**
Nursing staff with physician approval

# Witness information

## Witness

**Name**
Abby Riedel

**Alias/Nickname**
-

**Date of birth**
-

## Contact details

**Home phone**

**HHS employee, contractor, or grantee**
No

**Allegation type**
Other: Covering up hospital acquired pressure injuries and
false reporting and documentation of such

**Healthcare program**
Medicaid

**Program type**
Hospitals

**Date of activity**
6/11/2021

**Is the activity still happening?**
Yes

# Subject information

## Subject

**Type of subject**
Business

**Business/Department name**
Dayton Children's Hospital

**Doing Business As (DBA)**
-

**Employer ID Number (EIN)**
-

**Name**

Bridget Ann McGinley

**Date of birth**

12/31/1976

**Medicare number**

-

**Medicaid number**

-

**Social Security Number (SSN)**

-

# Your contact details

**Home phone**

-

**Cell phone**

4843477858

**Work phone**

-

**Personal email**

mcginleyrn2000@gmail.com

**Work email**

mcginleyrn2000@gmail.com

**Your home address**

1541 Sleepy Hollow Rd, Apt 5
Covington, KY 41011

## Your employment information

**HHS employee, contractor, or grantee**
No

 **The Joint Commission /**    **Report a Safety Event about a Health Care Organization**

---

**Safety Event Submission Confirmation**

**Print This Page For Your Records**

Thank you for submitting your safety event to The Joint Commission for review.

Visit the Office of Quality and Patient Safety webpage for information about the safety event review process.

**Please print this page for your records. If you are unable to print this page, make a note of your safety event incident number.** You will need this number to follow up with The Joint Commission or to submit an update to your safety event.

**Thank you for submitting your safety event!**        **Saturday, January 15, 2022**

**Your safety event incident number is:**              **43885QJO-74008ZQS**

---

© Copyright 2022 - The Joint Commission - All Rights Reserved



**The Joint Commission /**   **Report a Safety Event about a Health Care Organization**

Thank you for taking the time to share your patient safety concern or event regarding a Joint Commission accredited organization. The Joint Commission takes any information about one of our accredited organizations seriously.

Please be aware that The Joint Commission does not evaluate the care of an individual, or whether that care was appropriate. Instead, our evaluation focuses on processes that are required within our standards. Issues related to billing, insurance or labor disputes are not within The Joint Commission Standards. We encourage you to contact the organization directly for resolution.

Please complete the following to submit a safety concern or event regarding a Joint Commission accredited organization. (Note: If you can not locate an organization within the dropdown menu, the organization may not be accredited by The Joint Commission.)

**Health Care Organization Information**

| 1. Select the state/country *Required where the incident occurred: | 2. Select the city where the *Required incident occurred: | 3. Select the health care organization *Required where the incident occurred: |
|---|---|---|
| OHIO ⌄ | Dayton ⌄ | Dayton Children's ⌄ |

**Organization Name:** *Required    Dayton Children's Hospital

**Country:** *Required    United States

**Organization Street Address:** *Required    One Children's Plaza

**City:** *Required    Dayton

**State:** *Required    OHIO ⌄

**Zip Code:** *Required    45404-181

You have the option to submit your safety concern or event anonymously or you may provide your personal information if you wish to know the status of your submission.

Complete the information below if you would like The Joint Commission to notify you about the status of your safety concern or event. Your name/identity as the source will be kept confidential.

**Source Information**

| I am: *Required | Employee (current) ⌄ |
|---|---|
| **Salutation:** | Select... ⌄ |
| **First Name:** | Bridget |
| **Middle Initial:** | Ann |
| **Last Name:** | McGinley |
| **Email:** | mcginleym2000@gmail.com |
| **Suffix:** | Select... ⌄ |
| **Professional Credentials:** | RN ⌄ |
| **Street Address:** | 1541 Sleepy Hollow Rd, Apt 5 |
| **City:** | Ft Wright |
| **State:** | KENTUCKY ⌄ |
| **Zip:** | 41011 |
| **Your Company Name:** | Dayton Children's Hospital |

**Incident Information**

Date safety event occurred(mm/dd/yyyy):  _6/22/021_    *Required

**Incident Narrative:** Provide a brief overview of your safety event. Please limit your narrative to 3 pages (15,000 characters). *Required

I was hired as the Pressure Injury Prevention Nurse in Dec 2021. The previous wound care certified APRN was fired early last year but I have not been told why. She does not have disciplinary action on her Ohio nursing license. On assuming the new role I did a 6-month retrospective look at all the hospital-acquired pressure injuries and have found that there is blatant fraud in documenting wounds to avoid detection by regulatory bodies. I started my report from June of 2021 and have the patient list along with medical record numbers until Dec 2021. Pressure injuries were purposely mislabeled, not photographed, not treated and followed up on. Medical interventions that were necessary such as offloading devices and specialty beds were falsely documented. Documentation includes things like " Patient unable to be repositioned- pressure points offloaded" being documented sometimes for days on patients. Baseline Hospital-acquired pressure injury prevention along with wound staging and wound treatment was and has not been completed at least since June 2021 on many of the children.  When I brought this information to nursing leadership I was told that if I want a smooth job I will not involve myself in CMS requirements and I was told that I had only to focus on Solutions for Patient Safety bundle compliance. I offered changes and education but nursing leadership said that I was going to have to go through them to get any changes. Both the Nursing Leadership and Medical leadership has said that I am not allowed to do any staging of pressure injuries despite being certified in wound care. In fact, they have now banished me to a desk. I have a list of the medical records and children that have been involved in this for the past 6 months and can provide the information if requested. Mindful that this was only what I was able to detect on SPS records submitted and that real issues of Stage 3 and greater were hidden, I am requesting JACHO intervention before another child is hurt. I was also told that DCH has not had a stage 3 pressure injury since October 2019 but I know for a fact I saw one that was present on admission but was not documented that way on previous admissions. I am being threatened with fear and intimidation by certain staff members. I ask that someone please investigate. The previous APRN for wound care was Abigail Riedel. I also have a list of names of leadership that is very much aware of these violations. I filed a complaint with Ohio and was told that they would not handle this.

**Disclaimer/Confidentiality Waiver (Please read the disclaimer before submitting your safety concern or event)**

Thank you for taking the time to share your patient safety concern. The Joint Commission is here to help organizations improve. We will use your report to better understand systems of care and guide improvement.

We will review your report and determine how best to evaluate your concerns. This could include contacting the organization about your concern.

Should we decide to contact the organization about your concern, please confirm whether you give The Joint Commission permission to:

- Release your name as the source of this concern and share a copy of the information you have sent to The Joint Commission with the organization.

**Please select one:** *Required

◉ **Yes**, I give The Joint Commission permission to share my name, as the source of information and share a copy of the information I have sent with the organization.

  *If yes, please provide your first and last name in source information section

○ **No**, The Joint Commission may not share my name as source and a copy of the information may not be shared with the organization.

**\*Disclaimer:**

- Permission to share may not result in an inquiry, but it will enable sharing your name as source and a copy of the information should The Joint Commission decide to write the organization about your concern.
- If confidentiality is not waived, we may still act on your reported safety concerns following our established processes for anonymous reporting. Anonymous reporting is no promise of confidentiality since the organization could independently investigate and become aware of your identity.
- Please be aware that in line with our Public Information Policy, we cannot provide you with the organization's response should an inquiry be pursued.

Thank you for bringing your concerns to our attention and helping us with our mission of continuously improving healthcare.

[ Submit ]                           [ Printer Friendly ]

© Copyright 2022 - The Joint Commission - All Rights Reserved



**The Joint Commission /   Report a Safety Event about a Health Care Organization**

---

Enter the safety event incident number that was assigned to you when you first submitted your safety event and click ⋯⋯⋯ ⋯⋯⋯ ⋯⋯⋯⋯ button. If you do not have your safety event incident number, you will not be able to use this form. Please call The Joint Commission's Office of Quality and Patient Safety at (800) 994-6610. If you would like to start over, click the `Reset` button. Once the Incident Number is validated, you will be able to enter and submit your update to the safety event.

---

| Enter your safety event incident number: | | | |
|---|---|---|---|
| **43885QJO-74008ZQS** | Incident Number is Valid. | ⋯⋯⋯⋯⋯⋯⋯ | `Reset` |

---

**Incident Narrative (Provide a brief overview of your safety event update. Please limit your narrative to 3 pages (15,000 characters))** *Required

Yesterday 1/19 after again voicing concerns about false documentation surrounding patients' wounds, staging, and treatment of wounds along with lack of preventative measures and noncompliance with JACHO and CMS requirements. I was called into a meeting with the CNO Jayne Gmeiner, the Director of Clinical Safety Hila Collins, and my immediate director and director of the PICU Jen Isham I was shown how they wipe the EPIC chart of patients wounds to avoid regulatory reporting. I was then passively aggressively told to keep quiet. I am EXTREMELY concerned about the immediate welfare of the children in Dayton Children's Hospital. The patient whose chart they were wiping the stage 3 information out on was a 17-year-old paraplegic named Caden Smith MR # 627551. They are reporting his wound as being present on admission (which it was not) and "healed" as of yesterday but there is no picture to prove it. There are pictures that show he actually developed a greater severity of this coccyx wound during his hospital stay. He is not getting proper wound care because of administration will not let wound care team treat him. I am the only certified wound care nurse in the hospital and they will not let me offer recommendations and they are still telling me that I am only allowed to document stage 1 on patients!!! I have a list of about 200 other patients that were falsely reported on over the past 2 years. I can provide proof.

**Disclaimer (Please read the disclaimer before submitting your safety event)**

Your name as source will NOT be shared without your permission.

The Joint Commission may still act on your reported safety concerns following our established processes for anonymous reporting, although our evaluation may be more limited.

The Joint Commission policy discourages accredited/certified organizations from taking retaliatory actions against employees for having reported quality of care concerns to The Joint Commission

---

**Submit**          **Printer Friendly**

© Copyright 2022 - The Joint Commission - All Rights Reserved

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| [UNDER SEAL] )<br><br>Plaintiff/Relator )<br><br>v. )<br><br>[UNDER SEAL] )<br><br>Defendant/Respondent ) | Case No. 1*22CV89 ï  ·<br><br>**COMPLAINT**<br><br>**FILED EN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |

# DOCUMENT TO BE KEPT UNDER SEAL

/s/

Glenn Feagan (Bar No. 041520)
Deters Law II
5247 Madison Pike
Independence, KY 41051
Phone. (859) 363-1900
gfeagan@feaganlaw.com

Counsel for Relator [under seal]